STATE OF NORTH CAROLINA v. CARNELL JAMAR GANTT

No. COA03-19

(Filed 18 November 2003)

**1. Sexual Offenses— short-form indictment—second-degree sexual offense**

   The use of a short-form indictment for charging second-degree sexual offense was constitutional.

**2. Confessions and Incriminating Statements— drive to magistrate's office—comments by officer—not an interrogation**

   A defendant's statement to an officer during the drive to the magistrate's office was not the result of a custodial interrogation. The exchange between the officer and the unruly defendant was not the functional equivalent of questioning.

**3. Evidence— video of incriminating statement—unruly defendant inside patrol car—bag over head—not prejudicial**

   A video of an incriminating statement was admissible in a second-degree sexual offense prosecution where the video was taken inside a patrol car; defendant was drunk, suicidal, and banging his head against the protective shield behind the front seat; officers had placed a bag over defendant's head because of the head banging and defendant's spitting at officers; the court allowed only the portions of the tape showing defendant's statement; and the main concern at trial seemed to be prejudice to the State. The danger of unfair prejudice did not outweigh the probative value.

**4. Sentencing— rejection of plea bargain—court's comment— not prejudicial**

   There was no plain error in sentencing defendant for second-degree sexual offense in the court's comment about defendant rejecting an offered plea bargain. Although those comments cannot be approved, it cannot be said that defendant was prejudiced by a sentence between the requested minimum and maximum of the presumptive range under the facts of the case.

Appeal by defendant from judgment dated 4 June 2002 by Judge L. Todd Burke in Forsyth County Superior Court. Heard in the Court of Appeals 15 October 2003.

*Attorney General Roy Cooper, by Assistant Attorney General Meredith Jo Alcoke, for the State.*

*Belser & Parke, P.A., by David G. Belser, for defendant-appellant.*

BRYANT, Judge.

Carnell Jamar Gantt (defendant) appeals a judgment dated 4 June 2002 entered consistent with a jury verdict finding him guilty of second-degree sexual offense.

On 25 June 2001, defendant was indicted for second-degree sexual offense for having "unlawfully and willfully . . . engage[d] in a sexual offense with Charnessa Edwina Watson, by force and against her will." At trial, Charnessa Watson (Watson) testified that she and defendant, who was her boyfriend at the time, were sharing an apartment. On 11 May 2001, defendant started drinking beer in the afternoon and, by midnight, had consumed approximately twelve beers. Defendant and Watson joined a few other residents from their apartment complex for a social gathering in front of the building that night, during the course of which defendant became "[v]ery vulgar, rude." At one point, defendant told Watson he should throw a can of beer at her. Then at approximately 4:00 a.m. on 12 May 2001, defendant pushed Watson out of her chair, causing her to fall to the ground. Watson went to her apartment, where she lay crying on the living room couch. While she was pretending to be asleep on the couch, defendant entered the apartment twice to get beer from the refrigerator. Around 5:00 a.m., defendant came back to the apartment and tried to wake up Watson. Watson told defendant she "didn't want to be bothered." Defendant nevertheless began making romantic advances, and when Watson pushed him away, he started to wrestle with her. Watson told defendant "[r]epeatedly" to leave her alone. When the wrestling escalated to the point of defendant choking Watson, she screamed. During this struggle, the wraparound skirt Watson had been wearing was torn off, exposing her underwear. Defendant accused Watson of cheating and subsequently forced his hand inside her vagina. Watson continued "[k]icking, punching, [and] biting" defendant to get him to stop. Defendant withdrew his hand after a minute or two and bit Watson in her left thigh and the right corner of her mouth. Defendant then went to the kitchen to get a broom and "came towards [Watson] with the end of the broom," "aiming it" at her "[m]id-section below." Watson pushed the broom handle

away from herself. A neighbor who had heard the noise coming from Watson's apartment came and knocked on the front door. This caused defendant to "stop[] with the broom" and open the door. The neighbor walked past defendant to Watson's room where she gathered some clothes for Watson. As the neighbor and Watson attempted to leave the apartment, defendant stepped between them, but Watson pushed him aside and went to her neighbor's apartment. After trying to calm Watson down, the neighbor "left to go call the police but the police [were] already there."

Officer Danny Carter testified that the police found defendant in a bedroom closet in Watson's apartment. Officer Carter and another police officer had to struggle to get defendant, who was resisting, out of the closet and into handcuffs. Defendant did not receive any *Miranda* warnings at this time. Once defendant was handcuffed, Officer Carter also put leg irons on defendant and placed him in the backseat of the patrol car. Because defendant was spitting at the police officers and banging his head against the protective window separating the front and back seats of the vehicle, a bag was placed over defendant's head. Officer Carter further testified that during the ride to the magistrate's office, he turned on the vehicle's video camera that was placed with a view of defendant. While the camera was in operation, defendant told Officer Carter he had placed four fingers in Watson's vagina. This statement was recorded by the video camera, and the videotape was introduced into evidence and played for the jury over defendant's objection. Prior to Officer Carter's testimony, defendant had moved to exclude the statement he made in the patrol car on the basis that his Fifth Amendment rights had been violated. The trial court concluded defendant's statement was unsolicited and voluntary and therefore deemed the evidence admissible.

Watson was taken to a hospital where a registered nurse, Ethlyn Csontos, examined her. The nurse discovered bite wounds on Watson's left inner thigh and mouth. An examination of Watson's vaginal area revealed no injuries.

---

The issues on appeal are whether: (I) the short-form indictment issued against defendant is unconstitutional; (II) defendant's incriminating statement in the patrol car was obtained in violation of his *Miranda* rights; (III) inclusion of the videotape into evidence violated North Carolina Rules of Evidence 401 and 403; and (IV) the trial court penalized defendant for exercising his right to trial.

I

**[1]** Defendant first contends that the short-form indictment charging him with second-degree sexual offense was unconstitutional because it failed to allege all the elements of the offense and establish the trial court's jurisdiction to adjudicate the matter. In his brief to this Court, defendant acknowledges the binding precedent set by our Supreme Court, which has already determined this issue and held the use of short-form indictments to be constitutional. *See State v. Wallace*, 351 N.C. 481, 508, 528 S.E.2d 326, 343 (2000). As defendant only presents the issue for preservation purposes, we note this assignment of error and overrule it. *See State v. Brothers*, 151 N.C. App. 71, 79, 564 S.E.2d 603, 609 (2002), *appeal dismissed and disc. review denied*, 356 N.C. 681, 577 S.E.2d 895 (2003).

II

**[2]** Defendant also argues his statement to Officer Carter during the drive to the magistrate's office was inadmissible because it resulted from a custodial interrogation in the absence of a waiver of his *Miranda* rights.

Prior to being placed in the patrol car, defendant was not read his *Miranda* rights. The police video that captured defendant's statement shows defendant severely disturbed, repeatedly and forcefully throwing his head against the protective glass of the patrol car and engaging in suicidal talk. At one point during the ride, the following exchange between defendant and Officer Carter occurred:

Defendant: I didn't do nothing.

Officer Carter: She says differently.

For a few seconds thereafter, defendant again talked about killing himself, which was followed by:

Officer Carter: You broke into the lady's apartment. You were hiding in her closet.

Defendant: I got four fingers in her pussy.

*Miranda* protections apply only where an accused is subjected to custodial interrogation. *See State v. Young*, 317 N.C. 396, 407, 346 S.E.2d 626, 633 (1986). In this case, there is no question defendant was in custody at the time of his statement. The key inquiry therefore becomes whether defendant was "interrogated" by Officer Carter.

Interrogation has been defined as not only express questioning by the police but also includes "any words or actions on the part of law enforcement officials which they 'should know are reasonably likely to elicit an incriminating response from the suspect.'" *Id.* (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 64 L. Ed. 2d 297, 308 (1980) (footnotes omitted)). With respect to these other words or actions, also referred to as the functional equivalent of questioning, the focus is on the perceptions of the suspect rather than the intent of the law enforcement officials. *Innis*, 446 U.S. at 301, 64 L. Ed. 2d at 308. Yet because "the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Id.* at 301-02, 64 L. Ed. 2d at 308 (emphasis omitted).

In this case, Officer Carter did not question defendant. Instead, defendant, in the midst of his suicidal threats and self-destructive behavior, blurted out that he had not done anything. Officer Carter then commented that the victim had said otherwise. This comment and the two sentences that followed did not constitute the functional equivalent of questioning because the officer's remarks did not call for a response from defendant and therefore cannot be deemed as reasonably likely to elicit an incriminating response from defendant. Moreover, it is not certain from the above exchange and defendant's state of mind as portrayed on the videotape that defendant's admission was in fact responsive to the officer's comments.

This analysis comports with our Supreme Court's holding in *Young* affirming the admissibility of a defendant's incriminating statement to a law enforcement officer after the officer commented that he believed the victim based on the evidence and the fact that defendant had lied to him. *See Young*, 317 N.C. at 406, 408, 346 S.E.2d at 632-33. The officer's comment had been made in response to the defendant's question why the officer believed the victim's story and not his. *Id.* As defendant in the present case was therefore not "interrogated," the failure to inform him of his *Miranda* rights did not render defendant's statement inadmissible and the trial court properly allowed it into evidence. *See also State v. Smith*, 160 N.C. App. 107, 117, 584 S.E.2d 830, 836 (2003) (where the defendant's properly admitted incriminating statement was made after the police officer responded to a question by defendant).

III

**[3]** Next, defendant argues, as he did at trial, that the videotape should have been excluded from the evidence because it was not only irrelevant but unduly prejudicial. We disagree.

Rule 401 defines relevant evidence as such "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (2001). Rule 403 restricts the admission of relevant evidence by stating that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." N.C.G.S. § 8C-1, Rule 403 (2001).

As there is no stronger evidence than a party's own admission, the videotape, which captured defendant's incriminating statement, was clearly relevant to the issue of defendant's guilt. Although defendant argues in his brief to this Court that the trial court could have opted to only play the admittedly relevant *audio* portion of the videotape, defendant did not make such a request to the trial court and therefore is bound by plain error review.[1] *See State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (plain error is " 'fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done' ") (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir. 1982)) (emphasis omitted). Defendant, however, has not met his burden of showing prejudice, either under Rule 403 or under the standard for plain error. First, the trial court only allowed those portions of the videotape that included defendant's statement regarding the alleged incident and omitted extraneous portions merely showing defendant's self-destructive behavior in the patrol car. Further, as to the admitted portion, the trial court specifically instructed the jury "not to concern [it]self as to why [defendant] had [a] bag over his head." Finally, prior to this instruction, the main concern at the trial level appears to have been that the State, not defendant, could be prejudiced by the image of defendant with a bag over his head. Under these circumstances, we cannot say that a dan-

---

1. The transcript shows that defendant's comment to the trial court to possibly sever the audio portion from the video was merely a suggestion in an effort to accommodate the State's concerns and not the basis of any objection to the videotape by defendant. *See* N.C.R. App. P. 10(b)(1) ("[i]n order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling the party desired the court to make").

ger of unfair prejudice substantially outweighed the probative value of the evidence, *see* N.C.G.S. § 8C-1, Rule 403; *State v. Lyons*, 340 N.C. 646, 669, 459 S.E.2d 770, 783 (1995) (holding that in light of the trial court's limiting instruction, the probative value of certain testimony to show motive was not substantially outweighed by the danger of unfair prejudice), or that admission of the video segment constituted fundamental error. Accordingly, the videotape was properly admitted into evidence.

## IV

[4] Finally, defendant assigns error with respect to his sentencing. Specifically, defendant contends the trial court committed plain error by allowing defendant's decision to not plead guilty and to pursue a jury trial influence its sentence.

Although a sentence within the statutory limit will be presumed regular and valid, such a presumption is not conclusive. *State v. Boone*, 293 N.C. 702, 712, 239 S.E.2d 459, 465 (1977). "If the record discloses that the [trial] court considered irrelevant and improper matter in determining the severity of the sentence, the presumption of regularity is overcome, and the sentence is in violation of [the] defendant's rights." *Id.* A defendant has the right to plead not guilty, and "he should not and cannot be punished for exercising that right." *Id.* at 712-13, 239 S.E.2d at 465. Thus, "[w]here it can be reasonably inferred the sentence imposed on a defendant was based, even in part, on the defendant's insistence on a jury trial, the defendant is entitled to a new sentencing hearing." *State v. Peterson*, 154 N.C. App. 515, 517, 571 S.E.2d 883, 885 (2002).

During the sentencing phase of this case, the State argued for the trial court to "sentence [defendant] to the highest end on a Class C, record Level 3" and requested the imposition of a 116-month sentence, "the far end of the presumptive [range]." As support, the State pointed to the "dramatic escalation of violence" by defendant, who had assaulted Watson on prior occasions, and "continued to make her a victim." Defendant's counsel asked for a mitigated sentence, stating:

> [T]he offense he's been convicted of is certainly far beyond anything he's ever experienced as a Level 3. The absolute[] minimum sentence is 70 months. That is ample . . . deterrence. I understand that it would probably be a long shot to think the mitigated range[,] but certainly if a message needs to be sent, . . . that's enough time to send that kind of message.

STATE v. GANTT

[161 N.C. App. 265 (2003)]

The trial court then made the following statements in pronouncing defendant's sentence:

> At the beginning of the trial I gave you one opportunity where you could have exposed yourself probably to about 70 months but you chose not to take advantage of that. I'm going to sentence you to a minimum of 96 and a maximum of 125 months in the North Carolina Department of Corrections. That's a 125[-]month sentence; however, if you have good behavior and don't get in any trouble while you're in the Department of Corrections, you're only looking at seven years versus more than ten years. If you get in trouble while you're in the Department of Corrections, you'll have to serve that entire 125[-]month sentence[,] which is ten years and five months.

These statements do not rise to the level of the statements our Courts have held to be improper considerations of a defendant's exercise of his right to a jury trial. *See Boone*, 293 N.C. at 712, 239 S.E.2d at 465 (where the trial court expressly stated that it would be *compelled* to give the defendant an active sentence due to the fact that he had pled not guilty and the jury had returned a verdict of guilty as charged); *see also State v. Cannon*, 326 N.C. 37, 38, 387 S.E.2d 450, 451 (1990) (where "the trial judge told counsel in no uncertain terms that if defendants were convicted he would give them the maximum sentence"); *Peterson*, 154 N.C. App. at 516-17, 571 S.E.2d at 884 (where the trial court stated the defendant tried to be a "con artist" with the jury, "rolled the dice in a high stakes game with the jury, and it's very apparent that [he] lost that gamble," and the evidence of guilt was "such that any rational person would never have rolled the dice and asked for a jury trial"); *State v. Pavone*, 104 N.C. App. 442, 446, 410 S.E.2d 1, 3 (1991) (where during sentencing the trial court noted the prior chance to enter into a plea agreement and told the defendant "that having moved through the jury process and having been convicted, it is a matter in which [he was] in a different posture"). This case is more akin to *State v. Johnson*, in which our Supreme Court held that because, in contrast to *Boone*, "the record reveal[ed] no such express indication of improper motivation," the defendant was not entitled to a new sentencing hearing. *State v. Johnson*, 320 N.C. 746, 753, 360 S.E.2d 676, 681 (1987). Although we disapprove of the trial court's reference to defendant's failure to enter a plea agreement, "we cannot, under the facts of this case, say that defendant was prejudiced or that defendant was more severely punished because he exercised his constitutional right to trial by jury." *State v. Bright*, 301

ATLANTIC CONTR'G & MATERIAL CO. v. ADCOCK

[161 N.C. App. 273 (2003)]

N.C. 243, 262, 271 S.E.2d 368, 380 (1980). Based on the evidence in this case and defendant's history of previous assaults on the victim, indicating a "dramatic escalation of violence," the State argued for a 116-month sentence, "the far end of the presumptive [range]." More significantly, however, defense counsel conceded during sentencing that a minimum sentence of seventy months "would probably be a long shot." As it does not appear that defendant was prejudiced by the trial court's imposition of a sentence that fell between the requested minimum and maximum of the presumptive range, he is not entitled to a new sentencing hearing.

No error.

Judges McCULLOUGH and TYSON concur.